**Mark HOFFMAN, Plaintiff,**

v.

**CARGILL, INCORPORATED, Defendant.**

**No. C 97–3015–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

July 2, 1997.

John C. Werden, Jr., Van Dyke & Werden, P.C., Carroll, IA, for Plaintiff.

Robert D. Houghton, Shuttleworth & Ingersoll, P.C., Cedar Rapids, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS PENDING ARBITRATION OR ALTERNATIVELY TO DISMISS**

BENNETT, District Judge.

TABLE OF CONTENTS

I.  INTRODUCTION AND PROCEDURAL BACKGROUND .....................468
    A.  The parties, the Arbitration Clauses, and the Underlying Disputes ...........468
    B.  Procedural Background ...........................................469

II.  LEGAL ANALYSIS ..........................................................470
    A.  Cargill's Motion to Compel Arbitration and Stay Proceedings ...............470
        1.  Does the FAA apply to this action? ...............................471
        2.  Did the parties agree to arbitrate? ..............................471
            a.  Contractual language.......................................471
            b.  Enforcement ..............................................472
        3.  Are the disputes arbitrable: .....................................476
        4.  The motion to compel arbitration and stay proceedings ................477
    B.  Cargill's Alternative Motion to Dismiss................................477

III.  CONCLUSION ..............................................................478

An ounce of prevention, administered by way of a pre-dispute arbitration clause, has not fulfilled the aphorism's promise to be worth a pound of cure to the parties in this breach of contract lawsuit. Here, the plaintiff grain distributor and the defendant milling facility entered into a series of contracts for the sale and delivery of grain. Each of these contracts contained a provision directing the parties to binding arbitration in the event disputes related to their "transactions" arose. Disputes did arise, and, although the parties took preliminary steps toward arbitration, the plaintiff has renounced his intention to arbitrate and has instead filed this breach of contract lawsuit. Presently before the court is the defendant's motion to compel arbitration and stay proceedings pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* Alternatively, the defendant moves the court to dismiss plaintiff's complaint pursuant to *Fed.R.Civ.P.* 12(b)(6). The court must determine whether this action falls within the scope of the FAA, and if so, what course of action the parties must now follow to resolve their disputes.

## I.  INTRODUCTION AND PROCEDURAL BACKGROUND

### A.  The Parties, the Arbitration Clauses, and the Underlying Disputes

At the heart of the present controversy between the parties is a series of contracts gone sour. The plaintiff, Mark J. Hoffman, is a farmer who resides in Carroll County, Iowa. In addition to farming, Hoffman sells and transports grain. He asserts that he has "been in business many years and [has] sold over a million dollars of grain." Pl.'s Aff. in Supp. of Resistance to Def.'s Mot. ¶ 8. The defendant, Cargill, Incorporated, is a Delaware corporation maintaining its principal place of business in Minneapolis, Minnesota. Cargill owns and operates a wet corn milling facility in Blair, Nebraska. Between September of 1995 and March of 1996, Hoffman and Cargill entered into a series of ten grain purchase contracts[1] whereby Hoffman agreed to sell and deliver certain amounts of corn to Cargill's Blair facility. Cargill, in return, agreed to compensate Hoffman on a per bushel basis.

Although the contracts' specific terms varied, each contained the following clause, directly above the signature line:

> PLEASE NOTE: **Unless otherwise specified or modified herein, the rules of the appropriate association listed above shall govern this contract. All disputes relating to this transaction shall be resolved by binding arbitration in accordance with the rules of such associations. The parties agree to arbitrate, to be bound by the arbitration award, and agree that judgment upon the award may be entered in any Court having jurisdiction.**

Def.'s Exhibit A (emphasis in original). Additionally, each contract identified the National Grain and Feed Association ("NGFA")

---

1.  These contracts were generically described as "Purchase Confirmation[s] and Contract[s]" and numerically designated as follows: 10306, 10307, 10320, 10388, 11592, 12406, 12615, 12794, 12795 and 12887.

as the association providing the rules to govern arbitration proceedings.[2]

A variety of performance disputes erupted between the parties in 1996. Hoffman alleges that in January he "first became concerned about the scale procedures of Cargill Corn Milling." Pl.'s Compl. ¶ 18. Hoffman contends that Cargill's scales repeatedly provided inaccurate weights and measures, and that Cargill personnel improperly operated scale equipment. Hoffman states that his agents and employees questioned Cargill about the allegedly faulty scales and procedures, however Cargill failed to correct these problems. Hoffman also complains that Cargill failed to make timely payments under the contracts. For its part, Cargill denies that its scales and measuring procedures were inaccurate. Cargill attributes the parties' performance disputes to Hoffman's alleged failure to make deliveries as promised under the contracts. Cargill claims that despite "numerous attempts to accommodate Hoffman and facilitate his deliveries," Hoffman failed to perform. Def.'s Br. in Supp. of Mot. to Compel Arbitration and Stay Proceedings at 3. Cargill states that it subsequently "canceled" the contracts.

In December of 1996, Cargill initiated arbitration proceedings for five of the ten contracts. On December 3, 1996, Cargill and Hoffman executed a Contract for Arbitration as required by NGFA Rules. This contract provided that both parties agreed to submit disputes relating to contracts numbered 10306, 10307, 10320, 10388 and 12795 to arbitration by the NGFA. Cargill filed its First Argument with the NGFA on January 3, 1997. Hoffman submitted his combined Notice of Revocation of Agreement to Arbitrate and Answer on February 11, 1997. Hoffman's stated that he "revoke[d] the agreement to arbitrate this dispute and further [gave] notice of his intention to refuse to continue these arbitration proceedings." Hoffman asserted that the arbitration clauses were not enforceable under either Iowa or Nebraska law. He also argued that the NGFA arbitration rules were inadequate to

resolve the disputes between the parties, because they did not provide any discovery procedures.

### B. Procedural Background

On February 21, 1997, Hoffman filed this diversity lawsuit based on 28 U.S.C. § 1332. In Count I of his complaint, Hoffman seeks declaratory judgment that the arbitration clauses are invalid and thus unenforceable. In Count II, Hoffman seeks reformation of the contracts. In Counts III–VII, Hoffman seeks specific performance of the contracts as well as damages for breach of contract, misrepresentation, negligence, and conversion.

On March 17, 1997, in lieu of answering Hoffman's complaint, Cargill moved to compel arbitration and stay proceedings. Cargill contends that each of the grain contracts executed by the parties contains a valid, enforceable, and irrevocable agreement to arbitrate. Cargill asserts that these arbitration provisions are within the scope of the FAA, 9 U.S.C. § 1–16, and urges the court to compel arbitration and stay proceedings pursuant to 9 U.S.C. §§ 3–4. Alternatively, Cargill moves to dismiss Hoffman's complaint pursuant to Fed.R.Civ.P. 12(b)(6). Cargill contends that Hoffman's complaint "demonstrates that the dispute is subject to arbitration" and therefore fails to state a claim upon which relief may be granted. Def.'s Mot. to Compel Arbitration and Stay Proceedings ¶ 12.

Hoffman filed his resistance to Cargill's motion on May 15, 1997. Hoffman advances several arguments in support of his resistance.[3] First, he asserts that arbitration before the NGFA does not constitute "arbitration" as contemplated by the FAA or by the contracts. Essentially, Hoffman challenges the general validity of NGFA arbitration pro-

---

2. The NGFA's arbitration system was formally established in 1901, and is considered to be one of the oldest industry-based arbitration systems in the United States. David C. Barrett, Jr., *Arbitrating Agricultural Disputes: The National Grain-and Feed Association's Experience*, 68 N.D. L. REV. 539 (1992).

3. In his complaint, Hoffman also asserts that the arbitration provisions are unenforceable under Nebraska law because they are part of contracts of adhesion. Hoffman did not revisit this argument in his resistance. Because the court understands Hoffman to be advancing this argument to avoid arbitration, it will consider it as part of Hoffman's resistance to the present motion.

cedures. Second, Hoffman argues that, although his complaint seeks relief on all ten contracts executed by the parties, only five of these contracts are subject to the arbitration proceeding pending before the NGFA. Accordingly, Hoffman maintains that, even if the court stays proceedings relating to the five contracts pending before the NGFA, his claims as to the other five contracts should proceed in this forum. Third, Hoffman argues that his claims for misrepresentation and negligence are not arbitrable.

On May 27, 1997, Cargill filed its reply to Hoffman's resistance. Cargill maintains that all of Hoffman's disputes fall within the purview of the arbitration clause, and even if some claims are not arbitrable, they should be stayed pending arbitration of the remaining claims. Finally, Cargill argues that if Hoffman wishes to pursue claims relating to the five contracts not currently pending before the NGFA, he must do so via arbitration.

The court heard telephonic oral arguments on Cargill's motion on June 23, 1997. Cargill was represented by Robert D. Houghton, of Shuttleworth & Ingersoll, P.C., Cedar Rapids, Iowa. Hoffman was represented by John C. Werden, Jr., of Van Dyke & Werden, P.C., Carroll, Iowa. Having reviewed the relevant procedural history, the court now turns to the merits of the present motions.

## II. LEGAL ANALYSIS

### A. Cargill's Motion to Compel Arbitration and Stay Proceedings

Congress enacted the FAA[4] to abolish "the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts...." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991); *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974). Prior to its enactment, many states considered arbitration agreements to be revocable at will up until the time an arbitration award was issued. *Webb v. R. Rowland & Co.*, 800 F.2d 803, 806 (8th Cir.1986) (citing *Johnson*

*Controls, Inc. v. City of Cedar Rapids, Iowa,* 713 F.2d 370, 376 (8th Cir.1983)); *Collins Radio Co. v. Ex–Cell–O Corp.,* 467 F.2d 995, 997–98 (8th Cir.1972). A primary goal of the FAA was to avoid this sometimes harsh result and to "'place [arbitration] agreements upon the same footing as other contracts.'" *Allied–Bruce Terminix Co. v. Dobson,* 513 U.S. 265, 270–72, 115 S.Ct. 834, 838, 130 L.Ed.2d 753 (1995) (quoting *Volt Info. Sciences, Inc. v. Board of Trustees,* 489 U.S. 468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488 (1989)).

The Eighth Circuit Court of Appeals has observed that the FAA comprises a "statutory scheme for effectuating the federal policy of encouraging arbitration as a less costly and less complicated alternative to litigation." *Morgan v. Smith Barney, Harris Upham & Co.,* 729 F.2d 1163, 1165 (8th Cir.1984). Sections two through four of the FAA are key to the present motion. Section two provides that arbitration agreements contained in contracts involving maritime transactions or commerce[5] are "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Section three empowers federal courts to stay proceedings of issues referable to arbitration. 9 U.S.C. § 3. Section four directs courts, in certain circumstances, to compel the parties to arbitration pursuant to the terms of their written arbitration agreement. 9 U.S.C. § 4.

■ If the parties' arbitration agreement falls within the scope of the FAA, the court must engage in a two-part inquiry to ascertain whether the dispute is "arbitrable" before it orders the parties to proceed with arbitration. *Daisy Mfg. Co. v. NCR Corp.,* 29 F.3d 389, 392 (8th Cir.1994) (citing *Paine-Webber Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990)); *accord Hodge Bros. v. De-Long Co.,* 942 F.Supp. 412, 415 (W.D.Wis. 1996). First, the court must determine whether a valid agreement to arbitrate exists between the parties. *Daisy Mfg. Co.,* 29 F.3d at 392. Second, the court must determine whether the specific dispute or disputes fall within the scope of that agreement. *Id.*

---

4. The FAA was originally enacted in 1925, 43 Stat. 883. In 1947, it was reenacted and codified as Title 9 of the United States Code.

5. Section one of the FAA defines "commerce" to mean interstate commerce. 9 U.S.C. § 1.

If these requirements are met, the court may stay proceedings and compel the parties to arbitration. *See* 9 U.S.C. §§ 3–4.

Having reviewed the proper analytical framework for FAA claims, as well as the policies and goals behind the Act, the court now turns to Cargill's motion.

### 1. Does the FAA apply to this action?

■ As a threshold matter, the court must determine whether the FAA applies to the arbitration provisions at issue. *See Daisy Mfg. Co.,* 29 F.3d at 392. Section two of the FAA provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The inquiry is thus twofold: (1) are the arbitration agreements written; and, if so (2) are they part of a maritime transaction or a transaction involving interstate commerce? As to the first inquiry, the parties do not dispute that all ten grain purchase agreements contain identical written arbitration provisions.

The second inquiry is only slightly more troublesome. The parties apparently agree that under the basic terms of the contracts, Hoffman was to sell corn grown in Iowa to Cargill and deliver it to Cargill's milling facility in Nebraska.[6] Curiously, however, Hoffman contends that the contracts do not implicate interstate commerce because, they "were for delivery and sale to be fully performed in Blair, Nebraska." Pl.'s Compl. ¶ 17. The court finds this argument unpersuasive. The sale and delivery of goods across state lines demonstrates interstate commerce in its most basic form. *See Allied–Bruce Terminix Co.,* 513 U.S. at 270–74, 115 S.Ct. at 838–39; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* 388 U.S. 395, 401 n. 7, 87 S.Ct. 1801, 1805 n. 7, 18 L.Ed.2d 1270 (1967); *see generally, Farmers' Grain Co. v. Langer,* 273 F. 635 (8th Cir.1921). The fact that the sale and delivery actually took place in Nebraska is insufficient to remove these transactions from the realm of interstate commerce when at least part of the grain sold was grown in one state and transported to another for sale and delivery. *See Allied–Bruce Terminix Co.,* 513 U.S. at 276–82, 115 S.Ct. at 841–43.

### 2. Did the parties agree to arbitrate?

#### a. Contractual language

■ Next, the court must determine whether Hoffman and Cargill entered into an agreement to arbitrate. *See Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 833–34 (8th Cir.1997) (considering whether the parties agreed to arbitrate); *Houlihan v. Offerman & Co.,* 31 F.3d 692, 694 (8th Cir.1994) (noting that before a party may be compelled to arbitrate, the district court must determine whether a valid agreement to arbitrate exists); *Daisy Mfg. Co.,* 29 F.3d at 392 (stating that the district court must engage in a limited review to ensure that a valid agreement to arbitrate exists between the parties). Under the FAA, ordinary contract principles guide this inquiry. *Patterson,* 113 F.3d at 833–34.

The arbitration agreement contained in each of the contracts provides, in pertinent part, that "[a]ll disputes *relating to this transaction* shall be resolved by binding arbitration." (emphasis added). The contracts further provide that arbitration proceedings will be governed by NGFA Arbitration Rules. The parties have not denied that they entered into the contracts, nor have they denied that each of the contracts contains the arbitration provision. The court finds that the arbitration clauses clearly and

---

**6.** Although it is not clear from Hoffman's complaint, it is possible Hoffman intended to procure some of the corn contemplated by the contracts in Nebraska. In any event, whether some or all of the corn came from Iowa is irrelevant to the court's conclusion that the grain contracts involve interstate commerce.

unambiguously evidence valid agreements to arbitrate disputes related to the parties' purchase order contracts.[7]

### b. Enforcement

Although Hoffman apparently concedes that by entering into the purchase order contracts he agreed to arbitrate disputes "relating to [the] transactions," he advances two arguments against enforcing the clauses. First, Hoffman contends that the arbitration agreements are unenforceable under Nebraska law. Specifically, Hoffman argues that the grain contracts are contracts of adhesion and accordingly, the arbitration provisions are unenforceable pursuant to NEB. REV. ST. § 25–2602 (1996).[8] Second, Hoffman maintains that the arbitration procedures utilized by the NGFA are wholly inadequate for resolving his disputes, because they "do not allow a fair opportunity to present claims." Pl.'s Written Statement in Supp. of Resistance to Def.'s Mot. at 2.

As the Eighth Circuit Court of Appeals observed in Collins Radio Co. v. Ex-Cell-O Corp., § 2 of the FAA plainly forbids federal courts from applying "state statutes and decisions which limit arbitration agreements with rules not applicable to other contracts." Collins Radio Co., 467 F.2d at 998 (citing Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)); see also Doctor's Assoc. v. Casarotto, —— U.S. ——, ——, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996) (reiterating the Court's earlier observation that by enacting § 2 "Congress

precluded States from singling out arbitration provisions"); Perry v. Thomas, 482 U.S. 483, 492, n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987) (noting that a state-law principle "that takes its meaning precisely from the fact that a contract to arbitrate is at issue" fails to comport with § 2). Parties attempting to limit the enforceability of arbitration agreements covered by the FAA must now resort only to " 'grounds as exist at law or in equity for the revocation of any contract.' " Webb, 800 F.2d at 806 (quoting Southland Corp. v. Keating, 465 U.S. 1, 10–11, 104 S.Ct. 852, 858–59, 79 L.Ed.2d 1 (1984)).

In Webb v. R. Rowland & Co., the Eighth Circuit Court of Appeals considered an adhesion argument similar to the one advanced by Hoffman here. See Webb, 800 F.2d at 806–07. In that case, the contract contained a choice of law clause specifying that the agreement "shall be governed by the laws of the State of Missouri." Id. at 806. The Webbs contended that MO. ANN. STAT. § 435.350 (Vernon Supp.1986)[9] rendered the arbitration agreement unenforceable under state law. Id. The Webbs argued that the Customer Agreement was a contract of adhesion because it foreclosed any negotiation as to its terms. Id. Accordingly, the arbitration provision contained in the Customer Agreement was unenforceable pursuant to § 435.350. Id. The court flatly rejected this argument observing "contrary to the Webbs' assertions, [ ] federal law preempts state law with respect to the interpretation and con-

---

7. The parties have not argued the choice of law issue as to whether Iowa or Nebraska contract law should guide this court's interpretation of the arbitration provision. The court need not decide this issue, however, because the result would be the same under either state's law. See Harmsen v. Dr. MacDonald's, Inc., 403 N.W.2d 48, 50 (Iowa App.1987) (stating court will not resort to rules of construction where the intent of the parties is clear and unambiguous); McDonald's Corp. v. Goler, 251 Neb. 934, 560 N.W.2d 458, 461 (1997) (noting that language that is clear and unambiguous is not subject to interpretation or construction).

8. NEB. REV. ST. § 25–2602 governs the validity of arbitration agreements. This statute provides that "[a] provision in a written contract to sub-

mit to arbitration any controversy thereafter arising between the parties ... is valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract, if the provision (a) is entered into voluntarily and willingly and (b) is not part of a contract of adhesion." NEB. REV. ST. § 25–2602 (1996) (emphasis added).

9. The court quoted the following language from § 435.350: "a provision in a written contract, except contracts of insurance and contracts of adhesion, to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any-contract." Webb, 800 F.2d at 806 (emphasis added).

struction of arbitration agreements falling within the scope of the [FAA]." *Id.*

■ The court finds the reasoning in *Webb* applicable to Hoffman's adhesion argument. Hoffman asserts that each of the grain contracts constitutes a contract of adhesion, because "they are standardized forms offered by Cargill, Incorporated on a 'take it or leave it' basis without affording any realistic choice as to its [sic] terms." [10] Therefore, Hoffman contends, the arbitration agreements are revocable at will pursuant to NEB. REV. ST. § 25–2602. Hoffman's reliance on Nebraska arbitration law is misplaced. As the court has already concluded, the arbitration provisions at issue are within the scope of the FAA. Accordingly, any state law, including § 25–2602, which limits the enforceability of arbitration agreements *because they are arbitration agreements* fails to comport with § 2 and is therefore preempted by federal law. *See Webb,* 800 F.2d at 806–07; *accord Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d 282, 286 (9th Cir.1988) (reaffirming previous holding that state law adhesion principles may not be invoked to bar arbitrability of disputes under the FAA); *see also Dowd v. First Omaha Sec. Corp.,* 242 Neb. 347, 495 N.W.2d 36, 40 (1993) (observing that when Nebraska arbitration law conflicts with federal law, federal law prevails).

■ Hoffman's second argument against the enforcement of the arbitration clauses stems from his dissatisfaction with the fairness of NGFA arbitration procedures. Hoffman contends that cases submitted to arbitration before the NGFA are not considered by "impartial people," but rather by "grain company executives." Aff. in Supp. of Resistance to Def.'s Mot. ¶ 2. Hoffman also argues that the fees required by the NGFA for filings, hearings, and appeals are exorbitant. *Id.* ¶ 7. Finally, Hoffman complains that the NGFA Arbitration Rules provide neither "compulsory process" in the form of subpoena power, nor formal pre-hearing discovery. As a result, Hoffman contends, he is at Cargill's mercy to obtain needed evidence. *Id.* ¶ 4.

The Supreme Court has clearly counseled that when parties have chosen to utilize arbitration to settle their disputes, courts must respect that choice:

> Contracts to arbitrate are not to be avoided by allowing one party to ignore the contract and resort to the courts. Such a course could lead to prolonged litigation, one of the very risks the parties, by contracting for arbitration, sought to eliminate.

*Southland Corp.,* 465 U.S. at 7, 104 S.Ct. at 856–57. With this principle in mind, the court first turns to Hoffman's complaints of partiality and exorbitant fees.

Hoffman speculates that the NGFA arbitration panel is incapable of being impartial because it is comprised of "grain executives." Resistance to Mot. to Compel Arbitration and Stay Proceedings ¶ 1(b). Beyond this prophecy of bias, Hoffman offers no actual evidence or proof of partiality.

On at least two occasions, the Supreme Court has refused to entertain generalized assertions of arbitration panel bias. *Gilmer,* 500 U.S. at 30, 111 S.Ct. at 1654 (" '[w]e decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.' ") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 634, 105 S.Ct. 3346, 3358, 87 L.Ed.2d 444 (1985)). The *Gilmer* Court noted that the arbitration rules at issue provided certain safeguards against biased panels. *Gilmer,* 500 U.S. at 30, 111 S.Ct. at 1654. Specifically, the Court observed that the rules required the parties to be informed of the arbitrators' employment histories, and that the parties were also allowed to inquire into the arbitrators' background. *Id.* The rules also provided the parties with a "challenge" mechanism to remove potentially biased arbitrators. *Id.* Finally, the arbitrators themselves were required to disclose any information or circumstances bearing on their ability to be impartial. *Id.*

---

10. Because the court has already concluded that the arbitration provisions are within the scope of the FAA, it need not decide whether the grain contracts are contracts of adhesion or whether they would be revocable under NEB. REV. ST. § 25–2602.

Here, the court observes that the NGFA arbitration rules also provide certain safeguards against biased panels. Section four provides, in pertinent part, that "to qualify as an arbitrator, a member should be commercially disinterested with respect to the particular dispute intended to be presented to him for judgment." Arbitration Rules of the National Grain and Feed Association § 4, ¶ (b). Moreover, section eight provides that a potential arbitrator "shall disclose ... any circumstances likely to affect his impartiality, including any bias or any financial or personal interest in the result of the arbitration." *Id.* § 8, ¶ (a). This information is then transmitted to the parties who may request the member be replaced. *Id.* The parties are also notified of the names and addresses of potential arbitrators, and may challenge the appointment of any individual for "prejudicial or other cause." *Id.* The court concludes that Hoffman has made no showing in this record to support his speculation that the arbitration panel will be partial or that the safeguards provided in the rules will be inadequate to circumvent potential bias. Of course, Hoffman remains free to reassert this complaint post-arbitration if necessary. *See* 9 U.S.C. § 10(a)(2).

■ Hoffman also complains about the high fees charged by the NGFA for filings, hearings, and appeals. Although the court is not unsympathetic to this concern, the court is unable to relieve Hoffman of his obligation to pay these fees. Hoffman agreed to abide by NGFA rules in the event the parties proceeded to arbitration. The court may not simply ignore that agreement and release Hoffman from his obligations under it because he is now dissatisfied with the rules.

■ Hoffman's complaint regarding his inability to gain access to witnesses and relevant documents is far more troubling. Specifically, Hoffman complains that there are no mechanisms forcing Cargill to comply with his discovery requests. Hoffman contends that Cargill is effectively denying him access to needed documents and witnesses.

Further, Hoffman suggests that the NGFA's lack of subpoena power to compel witnesses to testify, combined with the lack of formal discovery procedures, forecloses him from a fair opportunity to present his claims.

■ The court is aware that parties agreeing to arbitration have relinquished their claim to the full panoply of procedural safeguards afforded parties to a court proceeding. *See Gilmer* 500 U.S. at 31, 111 S.Ct. at 1654–55; *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S.Ct. at 3354–55; *Bowles Fin. Group, Inc. v. Stifel, Nicolaus & Co.*, 22 F.3d 1010, 1011 (10th Cir.1994); *Yasuda Fire & Marine Ins. Co. v. Continental Cas. Co.* 37 F.3d 345, 353 (7th Cir.1994). However, this does not mean that an arbitration agreement jettisons away all notions of fairness. *See Bell Aerospace Co. v. Local 516*, 500 F.2d 921, 923 (2d Cir.1974) (stating "an arbitrator need not [observe] all the niceties [of] federal courts ... only grant ... a fundamentally fair hearing"). The Tenth Circuit Court of Appeals recently observed that "[c]ourts have created a basic requirement that an arbitrator must grant the parties a fundamentally fair hearing." *Bowles Fin. Group, Inc.*, 22 F.3d at 1012 (citing *Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349, 15 L.Ed. 96 (1854); *see also Employers Ins. v. National Union Fire Ins. Co.*, 933 F.2d 1481, 1491 (9th Cir.1991) (concluding that although a party did not receive a "perfect hearing," the party did receive a fair hearing); *Ficek v. Southern Pac. Co.*, 338 F.2d 655, 657 (9th Cir.1964), *cert. denied*, 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965) (noting court may decline to recognize an arbitration award if the arbitration proceedings do not provide *inter alia* a "full and fair hearing,"); *Areca, Inc. v. Oppenheimer & Co.*, 960 F.Supp. 52, 55 (S.D.N.Y.1997) (concluding parties were not denied a "fundamentally fair hearing"). The absence of a fair hearing may constitute a fifth ground, in addition to the four statutory protections set out in 9 U.S.C. § 10,[11] for vacating an arbitration

---

11. The FAA protects against certain abuses in the arbitration process *after an arbitration award has been issued. See* 9 U.S.C. § 10 (emphasis added).

For example, section ten provides that an arbitration award may be vacated:

(1)Where the award was procured by corruption, fraud or undue means;

award. *See McMahan & Co. v. Dunn New-fund I, Ltd.*, 230 A.D.2d 1, 656 N.Y.S.2d 620, 621 (N.Y.App.Div.1997) (citing *Bowles Fin. Group*, 22 F.3d at 1012–13).

Although arbitration proceedings may, and often do, provide much more limited discovery procedures than is common in regular court proceedings, a party must be provided a fair opportunity to present its claims. *See Gilmer*, 500 U.S. at 31, 111 S.Ct. at 1654–55 (rejecting a challenge to inadequate discovery procedures in arbitration proceeding when no showing was made that the arbitration rules were insufficient to allow a party a fair opportunity to present its claim). In *Gilmer*, the Supreme Court considered a direct challenge to arbitration procedures utilized in an ADEA claim. *Gilmer*, 500 U.S. at 31, 111 S.Ct. at 1654–55. The arbitration rules at issue provided for document production, information requests, depositions, and subpoenas. *Id.* The Court noted that although these discovery provisions were more limited than they would otherwise be in a court proceeding, there was no showing that claimants would be denied a fair opportunity to present their claims. *Id.*

Even the limited discovery provisions available in *Gilmer* do not appear to be available to Hoffman here. Having carefully reviewed the NGFA arbitration rules, it appears to the court that no formal discovery procedures are provided. This leaves Hoffman in the untenable position of pursuing informal discovery, limited to whatever Cargill may gratuitously provide him. The court expresses grave doubt that Hoffman will have a fair opportunity to present claims if, as lie suggests, Cargill refuses to provide pre-hearing discovery of witnesses, records, and other evidence. The court expresses the same grave concern about the fundamental fairness of the arbitration proceeding if Hoffman is denied the opportunity to subpoena adverse witnesses—particularly those employed by or otherwise under Cargill's control. It appears to the court that NGFA arbitration procedures have totally failed to heed the Supreme Court's warning, albeit in the civil litigation context, that meaningful procedures must be available to make the proceedings "less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958).

At this point in the proceedings, however, the FAA does not empower the court to relieve Hoffman of his obligation to abide by NGFA rules. *See* 9 U.S.C. § 10. Further, the court has been unable to locate any judicial authority for interfering with an arbitration proceeding between the parties at this point. *See Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3d Cir.1997) (noting that a party to an arbitration agreement cannot seek recourse to the courts until the arbitrators have reached a decision); *Smith, Barney, Harris Upham & Co. v. Robinson*, 12 F.3d 515, 520 (5th Cir.1994) (stating that the court can affect the arbitration proceedings by vacating, modifying, or correcting an award after it is rendered).

With grim reservation, the court concludes that it is unable to decline enforcement of the arbitration agreement at this posture of the proceedings. However, this conclusion does not mean that Hoffman has no remedy if indeed he is denied a fair opportunity to present his claims. To the contrary, after an arbitration award is issued, the court may modify or vacate that award if Hoffman demonstrates that he was denied a fundamentally fair hearing, or that the arbitration proceeding suffered a § 10 infirmity.

In sum, the court concludes that Cargill and Hoffman entered into a valid agreement to arbitrate all disputes relating to the ten grain purchase agreements. The court further finds that Hoffman's challenges regard-

(2)Where there was evident partiality or corruption in the arbitrators, or either of them; (3)Where the arbitrators were guilty ... in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; and

(4)Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10.

ing the sufficiency of the arbitration proceedings are premature at this stage of the proceedings. However, the court also notes that Hoffman is not without redress if he is unable to receive a fair opportunity to present his claims.

### 3. Are the disputes arbitrable?

■ Having concluded that the parties agreed to arbitrate, the court must now turn to the question of whether the specific disputes raised in Hoffman's complaint are arbitrable. *See Patterson,* 113 F.3d at 837; *Houlihan,* 31 F.3d at 694–95; *Daisy Mfg. Co.,* 29 F.3d at 392.

Cargill contends, of course, that all of Hoffman's disputes are arbitrable. It suggests that if the court has any doubt about arbitrability, it should resolve the question in favor of arbitration. Although the court is mindful that there is a strong federal policy favoring arbitration, parties must not be forced to arbitrate disputes that they did not agree to submit to arbitration. *See Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941 (agreeing with the courts of appeals that questions of arbitrability must be considered with "a healthy regard for the federal policy favoring arbitration"); *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 941–43, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995) (noting that the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate it).

■ Recently, the Eighth Circuit Court of Appeals considered the standard for determining whether a court or an arbitrator determines arbitrability. *McLaughlin Gormley King Inc. v. Terminix Int'l Co.,* 105 F.3d 1192, 1193 (8th Cir.1997) (citing *First Options of Chicago, Inc.,* 514 U.S. at 941–43, 115 S.Ct. at 1923. If the parties clearly and unmistakably agreed to arbitrate the arbitrability question, the court properly leaves the question to the arbitrator. *Id.*) If, however, no such intent is revealed in the arbitration provision, the court must determine the arbitrability in the first instance. *Id.* at 1194.

In *First Options of Chicago, Inc.,* the Supreme Court explained:

[t]he law treats silence or ambiguity about the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question 'whether a particular merits-related dispute is arbitrable because it is within the broad scope of the arbitration agreement.'

*First Options of Chicago, Inc., Id.* at 943–45, 115 S.Ct. at 1924. Here, the arbitration provisions do not "clearly and unmistakably" evidence the parties' intent to have the arbitrator decide the question of arbitrability. In fact, the arbitration provisions are silent on that issue. Therefore, the court will consider the arbitrability of Hoffman's remaining claims in turn.[12]

■ The arbitration provision found in each of the grain purchase orders is quite broad. The clause provides that *"all disputes relating,* to this transaction shall be resolved by binding arbitration ...." (emphasis added). Clearly Hoffman's breach of contract claim constitutes a "dispute[ ] relating to [the] transaction." The transaction, of course, is the delivery, sale and purchase of corn. Hoffman's breach of contract claim alleges that Cargill failed to perform under the contract. This claim is undeniably within the scope of the arbitration provision.

■ As Cargill points out, Hoffman's misrepresentation, negligence, and conversion claims also constitute disputes relating to the transaction. Each of these claims goes directly to Cargill's alleged failure to perform under the contracts. Hoffman's claims for misrepresentation and negligence stem from Hoffman's contention that Cargill maintained faulty scales and employed inadequate weighing procedures. As a result, Hoffman alleges he was under compensated for trucking These claims relate directly to the adequacy of Cargill's performance under the grain purchase contracts.[13] As to the

12. The court has already addressed Hoffman's declaratory judgment and reformation claims to the extent that it finds the arbitration provisions are valid and enforceable agreements to arbitrate.

13. During oral arguments, the court understood Hoffman's counsel to allude to the possibility

conversion claim, Hoffman contends that Cargill willfully converted certain amounts of his grain and as a result, he was damaged. The gravamen of this complaint is that Cargill received grain without compensating Hoffman according to the terms of the purchase agreements. Again the court finds that this claim relates directly to Cargill's performance.

The court concludes that Hoffman's claims for breach of contract, misrepresentation, negligence, and conversion relate directly to Cargill's alleged failure to perform under the grain contracts. Because the disputes fall within the scope of the broad arbitration provision, the court finds they are "arbitrable" within the meaning of the Act.

### 4. The motion to compel arbitration and stay proceedings

■ Having concluded that Hoffman and Cargill entered into a valid agreement to arbitrate and that the disputes raised in Hoffman's complaint are arbitrable, the court must now consider whether to order the parties to arbitration. Section four of the FAA provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and *upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement* ...

9 U.S.C. § 4 (emphasis added). The making of the arbitration agreement is not in issue here. Further, Hoffman acknowledges that he has failed to comply with the arbitration provision. In fact, in his complaint, Hoffman states that he "refuses to arbitrate under Contract Nos. 10306, 10307, 10320, 10388 and

12794." Pl.'s Compl. ¶ 46. Hoffman's self-proclaimed refusal to participate in arbitration proceedings in compliance with the agreement leads the court to conclude that an order directing the parties to arbitration is warranted under § 4.

■ Finally, the court must decide whether to stay proceedings pending arbitration of the disputes before the NGFA. Section three of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall upon application of one of the parties stay the trial of the action until such arbitration has been had....

9 U.S.C. § 3. As previously discussed, the court finds Hoffman's breach of contract, misrepresentation, negligence, and conversion claims to be referable to arbitration under the parties' agreement. Accordingly, the court concludes that a § 3 stay of proceedings pending in this forum is appropriate.

As Hoffman points out in his resistance, presently only five of the ten contracts are pending before the NGFA. The court notes that its analysis here applies with full force to Hoffman's claims against all ten of the grain purchase contracts. Hoffman is certainly entitled to pursue claims against the remaining five contracts in accordance with the arbitration agreement if he so chooses. However, in the interest of the parties and judicial efficiency, all proceedings in this court will remain stayed pending the outcome of arbitration.

### B. Cargill's Alternative Motion to Dismiss

Because the court has decided to compel arbitration and stay these proceedings, it

---

that the misrepresentation and negligence claims are aimed at contracts other than the ten grain purchase agreements referenced in Hoffman's complaint. The court has not found any support

for this contention in the existing pleadings and accordingly, understands these claims to be directed solely to the ten grain purchase agreements.

need not address Cargill's alternative motion to dismiss.

## III. CONCLUSION

The court concludes that the arbitration provisions at issue are within the scope of the FAA because they are contained in contracts involving interstate commerce. The court also finds that the arbitration provisions unambiguously evidence the parties' intent to submit disputes relating to the grain contracts to arbitration before the NGFA. Hoffman's breach of contract, misrepresentation, negligence, and conversion claims are referable to arbitration because they relate directly to the parties' performance under the contracts. Hoffman has announced his refusal to willingly participate in arbitration proceedings and, accordingly, the court concludes an order compelling the parties to arbitration is warranted. Finally, in the interest of the parties and judicial efficiency, the court concludes that all proceedings should be stayed in this forum pending the outcome of arbitration.

Based on these conclusions, Cargill's motion to compel arbitration pursuant to 9 U.S.C. § 4 is **granted,** and all proceedings in this forum are **stayed** pursuant to 9 U.S.C. § 3.

One final word of caution. In this age of complex and costly litigation, the incantation "ADR" (alternative dispute resolution) is an increasingly popular mantra. Arbitration, a longstanding form of ADR, is considered by some to be a panacea for the perceived evils of civil litigation. However, when arbitration proceedings fail to reach a minimum level of fairness, they become an "alternative" by which this court will not abide. The court is acutely aware that through § 10 of the FAA, Congress has placed strict limitations on its discretion to review the adequacy of arbitration proceedings. Nevertheless, upon request of either party, this court is committed to a post-arbitration review to ensure that

any result reached is the product of a fundamentally fair arbitration proceeding.

**IT IS SO ORDERED.**